# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

JURY TRIAL DEMANDED

JANE DOE,

      Plaintiff,

vs.

UNIVERSITY OF MIAMI,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jane Doe ("Plaintiff") brings this suit against Defendant University of Miami ("University" or "Defendant") under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 ("Rehabilitation Act"), and under common law.

## PRELIMINARY STATEMENT

1.      In the fall of 2013, during the first three weeks of her junior year, Jane Doe was raped, stalked, and physically assaulted by a fellow student. She reported these incidents on September 16, 2013 to the University. Out of concern for her safety and for her mental health, she requested that the University allow her to withdraw for the semester without notations on her transcript. The University refused this request and further refused to require Plaintiff's professors to accommodate her requests for extensions of time to complete assignments, to excuse absences, or to delay her final exams.

2.      During the semester, Plaintiff's attacker continued to stalk her. A few days before the University hearing, at the end of the semester, he accepted responsibility for the stalking and was further found responsible for rape, sexual harassment, and battery at the University hearing. On December 17, 2013, he was arrested and ultimately pled guilty to the stalking in criminal proceedings.

3.      Plaintiff was haunted by the trauma of the rape, the repeated stalking, and the continuous fear she was forced to endure as a consequence of seeing her attacker on campus. Early in the semester, she was diagnosed with anxiety and depression. The University acted with deliberate indifference in its arbitrary refusal to allow Plaintiff to return home, and in its subsequent failure to engage in an interactive process to provide Plaintiff the most basic academic accommodations.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Jane Doe is a resident of Texas.

5.      Defendant University of Miami is a private educational institution located in Coral Gables, Florida.

6.      Defendant receives federal funding and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

9.      On August 23, 2013, at the start of her junior year at the University of Miami, Plaintiff was raped by a fellow student ("Assailant") in her off-campus apartment building,

inhabited exclusively by the University's students and referred to by students as "Red Road." She had met her Assailant in school through the Hindu Student Council and had recently begun dating him. The morning after the rape, she ended the relationship. Assailant expressed frustration and exasperation at the termination of the relationship.

10.     Approximately a week after the rape, Assailant came to Plaintiff's apartment unannounced at three in the morning. He banged on the door and yelled for Plaintiff. Plaintiff grew worried about his mental state. Plaintiff's friend, who was at her apartment at the time, opened the door. Plaintiff and her friend noticed that Assailant was in an agitated state, perhaps intoxicated, and at one point lifted his fist as if to strike Plaintiff. Plaintiff's friend escorted Assailant home and suggested that Plaintiff call the police. However, Plaintiff did not wish to call the police and escalate the situation.

11.     A few nights later, Assailant once again came unannounced to Plaintiff's door and called her repeatedly on her cell phone. In a series of four text messages, he told her:"[Plaintiff] please call me;" "I swear to God I will come to red road [the name of Plaintiff's apartment building]; "Please;" "I'm at your door." Plaintiff was not at her apartment that evening.

12.     Assailant was a Resident Advisor ("RA") at Mahoney Dormitory on campus, and Plaintiff became concerned about Assailant's behavior and how it might impact the students for which he was in charge. On September 11, 2013, Plaintiff spoke with Mr. Oscar Vazquez, the Assistant Area Director for the Mahoney and Pearson Dormitories, who oversaw the RA program, about Assailant's troubling behavior and messages. Mr. Vazquez informed Plaintiff that he would speak to Assailant, but he did not advise Plaintiff to speak with anyone else at the University or about her rights under Title IX.

13.     Upon information and belief, while Mr. Vazquez spoke with Assailant about his behavior, he did not advise any other administrators at the University about the matter at the time.

14.     On Friday, September 13, 2013, at a fraternity party at Delta Epsilon Psi, Plaintiff ran into Assailant. She avoided him, but Assailant saw Plaintiff with her friends, approached her, and physically pushed her in an aggressive manner before walking away. During the party and in the hours after, he called Plaintiff's cell phone and left her five troubling voice messages, telling her that she had ruined his life and that he would harm himself unless she spoke to him. At three in the morning after the party, he wrote her a series of six texts, referring to himself in the third person, blaming Plaintiff for being thrown out of the fraternity rush process due to his erratic behavior at the party: "[Assailant] tried to hurt himself for you cause you weren't there;" "He'll never be a part of depsi [the fraternity] now;" "And all that happened simply because you refused to talk to him;" "He will never be a part of depsi now thank you so much for your contribution."

15.     The fraternity brothers at the party attempted to restrain Assailant and to deescalate the situation. They ultimately decided to escort him to his dormitory, where he was an RA. The following morning, one of the fraternity brothers reported Assailant's behavior at the party to Dean William A. Lake, who was in charge of student affairs and Title IX investigations, because they were afraid for Plaintiff's safety and knew the University needed to do something to protect Plaintiff from further harm.

16.     Upset and concerned for her own safety, Plaintiff decided to spend the night with a friend. That night, another close friend of Plaintiff's who lived on Assailant's hall reported to Plaintiff that Assailant had banged on her door, perhaps suspecting that Plaintiff was staying with her. When she learned of the incident, Plaintiff grew even more afraid for her safety.

17.     Plaintiff reported these incidents to Dean Lake the following morning and scheduled a time to meet with him on Monday, September 16, 2013.

### *Plaintiff Reports the Rape, Stalking, and Physical Assault to the University*

18.     On September 16, 2013, Plaintiff met with Dean Lake along with administrator Nicole Abramson to report the rape, the several incidents of harassment and stalking, and the physical assault at the party. Plaintiff described each of the incidents to Dean Lake. She expressed concern for her safety and well-being. Dean Lake seemed concerned only with the events affecting Greek life and the events that unfolded at the fraternity party, but he did not seem concerned with the Plaintiff being raped or stalked.

19.     In that meeting, Dean Lake stated that he would talk to Assailant and ask him about the events that transpired at the party. Plaintiff pressed him to investigate the rape itself as well. Dean Lake mentioned that he would issue a no-contact directive and stated he would "take care of" the situation.

20.     Neither Dean Lake nor Ms. Abramson informed Plaintiff of her rights, the next steps in the Title IX process, including whether a hearing would take place, or any of her other options, such as reporting to the police or seeking a protective order, at any point during the meeting. Dean Lake stated to Plaintiff that he would email her information about her rights, claiming he was in the process of drafting or revising this information. Plaintiff never received any such information from Dean Lake.

21.     Plaintiff's mother was sitting outside of Dean Lake's office during the meeting. When the meeting was finished, Dean Lake spoke with her and assured her that Plaintiff would be safe at the University.

22.     After her meeting with Dean Lake, Plaintiff met separately with Ms. Abramson, the administrator at the University charged with providing mental health referrals and academic accommodations to students, to discuss resources for Plaintiff.

23.     Plaintiff had grown increasingly anxious, traumatized, and upset by the troubling and continuing events following the rape. Plaintiff requested that she be allowed to withdraw from the University that semester without any notations on her transcript to allow her to return home safely to her family and take care of her mental health. Ms. Abramson stated that this was not possible and that if she withdrew, she would receive "W" notations on her transcript for each of the courses from which she had withdrawn. She offered no explanation for this arbitrary and draconian stance.

24.     Furthermore, the University was unwilling to offer Plaintiff any other suggestions regarding academic accommodations or support.  Instead, Ms. Abramson told Plaintiff that she would have to request accommodations from each of her professors individually and that her professors had ultimate discretion on how to address her situation. In other words, she put the burden entirely on Plaintiff and made clear that the University would not help.

25.     Ms. Abramson did not inform Plaintiff of her right to an accommodation under Title IX that would enable her to pursue her education without fear for her safety that resulted from the rape, stalking, and physical assault. She further failed to engage in any process with Plaintiff to determine how to provide reasonable academic accommodations under the circumstances.

26.     The afternoon of September 16, 2013, still concerned for her safety, Plaintiff decided to report the stalking incidents to the Coral Gables Police Department, despite the University's failure to inform her that she could report the incident to the police. She provided

testimony and documentary evidence to the police, such as Facebook messages and text messages. The police began investigating the case and informed Plaintiff of various resources available to her. They expressed concern that the University had not informed Plaintiff of her option to make a police report.

27.     Around the same time, Plaintiff scheduled a session with the counseling center for Thursday September 19, 2013. Unfortunately, the counseling center called Plaintiff to reschedule her session for the following day, Friday, September 20, 2013, out of fear that Plaintiff and Assailant would run into each other at the counseling center, around the time of Assailant's appointment.

28.     Plaintiff became increasingly upset, overwhelmed with her mounting workload, and anxious to speak with a professional. On Wednesday, September 18, 2013, out of obvious distress, Plaintiff once again reached out to Ms. Abramson, asking for help, explaining that "[w]hen[the counseling center] rescheduled me I was okay with it because I thought I had it together but I really need to talk to someone." She further underscored to Ms. Abramson the challenge of keeping up with her schoolwork: "I'm trying hard to keep up with all of my commitments and school but I am actually just not able to. Please advise me about what to do."

29.      In response, Ms. Abramson asked Plaintiff to call her as soon as possible to address her counseling appointment. But with respect to her academic accommodations, she vaguely offered "some sort of notification to your professors" without any meaningful and clear accommodation. Ms. Abramson once again refused to engage in a collaborative process to address Plaintiff's academic concerns. Instead, she simply emailed Plaintiff's professors to notify them that Plaintiff was experiencing a difficult situation and would be getting in touch with her professors shortly to discuss "potential opportunities to make up missed work." While this email

is acknowledgement on behalf of the University of the toll the situation was having on Plaintiff, this email did nothing more than place even greater burden on Plaintiff with no assistance to attempt to obtain the needed accommodations Plaintiff was requesting and needed.

30.     In late September or early October, the school counselor treating Plaintiff officially diagnosed her with anxiety and depression. Plaintiff informed Ms. Abramson that she was struggling with anxiety and depression, but Ms. Abramson never engaged in any process to provide Plaintiff a reasonable accommodation and an equal access to her education.

***Assailant's Violation of the No Contact Directive***

31.     Approximately two weeks after the September 16, 2013 meeting, Assailant violated the no-contact directive for the first time. Plaintiff immediately reported the violative incident to Dean Lake by telephone, stating that she was increasingly worried about her safety and afraid for her life.

32.     In response, Dean Lake told Plaintiff that the no-contact directive was simply a suggestion that the University could not meaningfully enforce. Placing the onus (and blame) on Plaintiff, Dean Lake advised Plaintiff to "avoid those situations" in which Assailant would come in contact with her. This was nearly impossible without Plaintiff's avoiding all campus facilities and activities, including classes, therapy appointments, the library, the student center, or any other facilities on campus. His only suggestion was for Plaintiff to call him again the next time Assailant violated the order.

33.     Dean Lake's suggestion to "avoid those situations" clearly violated Title IX by failing to provide Plaintiff equal access to her education.

34.     From September to December 2013, Assailant stalked Plaintiff in violation of the no contact directive approximately 9-10 times. Plaintiff reported these incidents to Dean Lake, but he took no action in any of these instances.

35.     Early in the semester, Plaintiff started hearing from acquaintances that Assailant was asking mutual friends for photographs of Plaintiff. Approximately five to six times throughout the semester he asked at least three mutual acquaintances for photographs and threatened to hurt himself if the friends did not comply with his requests. These friends grew worried for Plaintiff, and Plaintiff reported these incidents to Dean Lake, but again he did not take action against Assailant. In fact, the witnesses themselves attempted to report these incidents to Dean Lake, but he told them that he did not need their statements.

36.     In or around mid-October, Dean Lake requested to speak with Plaintiff to discuss Plaintiff's sexual assault allegations. During this meeting, Dean Lake suggested to Plaintiff that perhaps Assailant had inserted his fingers and not his penis into Plaintiff's vagina, and that this was not rape. He told Plaintiff that she should "feel bad" for Assailant because he did not have many friends and that Assailant may not have meant to be violent toward her during the September 13, 2013 fraternity party. He suggested that Plaintiff withdraw the rape allegations since the Assailant would likely be punished regardless. Instead of investigating Plaintiff's allegations, Dean Lake attempted to sweep them under the rug.

37.     During this meeting, Plaintiff again reiterated her concerns for her safety and her suspicion that Assailant was following her. Dean Lake did not address these concerns.

38.     In another in-person meeting that took place in October with Dean Lake, Plaintiff and Plaintiff's friend reported that Assailant had followed other female freshman students, who reported the incident to Plaintiff's friend. Dean Lake was dismissive and told them that the

freshman women had to figure out for themselves if Assailant was dangerous. He advised them not to talk about Assailant with anyone.

39.     One evening in late October or early November of 2013, Plaintiff exited the elevator of her apartment building and saw a man in a black hoodie waiting across from her door. Plaintiff believes that the man in the hoodie was Assailant. She immediately closed the elevator door, left her apartment building, and stayed at a friend's house. Plaintiff had an important exam the following day, but was unable to rest or concentrate before her exam.

40.     Fearing for her life, and realizing that the University would take no measures to keep her safe at school, Plaintiff reported the stalking to the Coral Gables police department as she left her apartment building that night.

41.     On Tuesday, November 26, 2013, right before Thanksgiving break, Plaintiff received notice that a hearing at the University to determine the responsibility of Assailant for the charges Plaintiff brought against him had been scheduled for Tuesday, December 10, 2013.

42.     Upon her return to school, she grew concerned that Assailant had begun stalking her more aggressively, potentially due to the notice of hearing that they had received.

43.     On the first day after returning from break, December 2, 2013, Plaintiff was in the process of setting up a table for an HIV/AIDS awareness organization event when she noticed that in the span of less than ten minutes, Assailant had walked by her table numerous times.

44.     The following day, on December 3, 2013, Assailant spotted Plaintiff outside of the student center. Plaintiff was talking to another male friend, and Assailant approached Plaintiff and began listening to her conversation with her male friend. Plaintiff asked her friend to accompany her to her car.

45.     In an email to Dean Lake on December 4, 2013, Plaintiff reported these incidents to Dean Lake, stating, "I am worried about my safety." She did not receive a response from Dean Lake for several days.

46.     On December 8, 2013, Plaintiff once again emailed Dean Lake to inform him of another incident in which a freshman student called her to let Plaintiff know that Assailant had asked "many freshman to let him know if [Plaintiff] was present and drinking at a party that would be taking place Friday night [December 6, 2013]." The freshman mentioned that they felt Assailant's question was "'creepy' and didn't want to get involved."

47.     On December 9, 2013, Dean Lake finally responded, informing Plaintiff that after meeting with Assailant that morning, "there will be no further charges for [Assailant], but the 'no contact' directives were reiterated by Dean Hall." He explained that Assailant was only asking others about Plaintiff's attendance at the party to determine whether she would be in attendance, and once he saw her RSVP on Facebook, he decided not to attend the party. Dean Lake remarked in his email, "[e]ssentially, he was doing exactly what he had been instructed to do."

### The University Hearing

48.     In the days before the hearing, Assailant accepted responsibility for sexual harassment and physically assaulting Plaintiff, but did not accept responsibility for the rape allegations. At that point, in a meeting with Plaintiff, Dean Lake once again suggested that Plaintiff drop the rape allegations against Assailant, since he would likely be punished and suspended simply for accepting responsibility for the stalking.

49.     Plaintiff refused to drop the rape allegations. As a result, a hearing was held on December 10, 2013, only a few days before Plaintiff was to begin her final examinations for the semester.

50.     Since the hearing took place during final exams, Dean Lake told Plaintiff that he would write excuses for any of Plaintiff's witnesses who wished to be excused from an exam to testify at the hearing. However, the day before the hearing, Dean Lake changed course and refused to write excuse notes for Plaintiff's witnesses, without explanation. As a result, Plaintiff's academic advisor who helped Plaintiff prepare for the hearing and who attended the hearing with Plaintiff reached out to the students' professors and obtained permission for Plaintiff's witnesses to testify.

51.     On December 10, 2013, Plaintiff attended and participated in the University hearing, in which Assailant was found responsible for sexual assault and battery, intimate partner/dating violence, underage drinking, physical assault, and sexual harassment by a panel of three members of the University community, including the Dean of Greek Life, a nurse, and a student. Dean Lake conducted the hearing but was not a member of the panel. The panel found Assailant responsible almost immediately after the hearing, and Plaintiff was notified of the outcome that same day.

52.     Despite the hearing findings, Assailant was allowed to remain on campus, in disregard for Plaintiff's requests to have him removed from campus during finals week for her safety. On December 11, 2013, Plaintiff wrote to Dean Ricardo Hall that "[Assailant] was found responsible for sexual assault and battery amongst other charges yesterday and I am seeing him on campus immediately afterwards. I feel very unsafe on campus and doing normal things like studying in the library." Dean Lake told Plaintiff that this was not possible and any punishment against Assailant was to be decided by Dean Ricardo Hall.

53.     Worried about her safety and about retaliation from Assailant and knowing that the University was not going to help, on December 12, 2013, Plaintiff obtained an emergency protective order in Dade County.

54.     Soon thereafter, Plaintiff met with Dean Ricardo Hall to discuss Assailant's punishment. She recommended that Assailant be expelled. The University of Miami ultimately expelled Assailant on December 16, 2013.  However, Assailant remained enrolled in the University.

55.     That same day, Plaintiff emailed Ms. Abramson to once again request an academic accommodation. Specifically, Plaintiff requested to take incompletes and finish her exams after the break due to the stress and the time-consuming nature of the hearing, the police reports, and the filing of the order of protection. In addition, she requested that her professors excuse her past absences during the semester, which she incurred because of therapy appointments and out of fear of being injured by Assailant on campus. She reiterated that she was suffering from extreme anxiety and depression and asked an accommodation for her disability.

56.     Ms. Abramson told her that anxiety and depression did not constitute disabilities, and therefore, she would not be able to receive an accommodation on account of her diagnosis. Ms. Abramson's response was a gross misstatement of the law.

57.     In an email, she simply reiterated that "[t]he specific arrangements to complete the Incomplete must be communicated between you and your professors directly." Furthermore, even six days after Assailant had been found responsible, Ms. Abramson nonetheless instructed Plaintiff to "inform your professors if you have any documentation from a medical or mental health professional to support your situation." Ms. Abramson emailed Plaintiff's professors

simply relaying Plaintiff's request to take incompletes until she could complete her exams. She requested that the professors reply directly to Plaintiff.

58.     One of Plaintiff's professors made it exceedingly difficult for Plaintiff to receive extensions. As a result, Plaintiff had to meet with her professor in person and plead for an extension, explaining to him that she had been raped. She felt humiliated by the experience. The professor ultimately granted her request.

59.     Plaintiff was unable to complete all of her coursework that semester, even with the extensions she received. She received failing grades in two of her courses, entirely uncharacteristic for Plaintiff. To this day, nearly four years later, Plaintiff is still in contact with the University to attempt to finish the coursework in those classes and improve the grades on her undergraduate transcript.

*Criminal Proceedings Against Assailant*

60.     On December 17, 2013, Assailant was arrested and interrogated by the police, at which time he admitted to stalking Plaintiff. The police department asked Plaintiff if she wished to proceed with the prosecution, which she did.

61.     In the spring of 2014, Assailant ultimately pled guilty to stalking Plaintiff. As part of his sentencing, Assailant was required to complete a sex offender program, perform community service, be placed on probation for three years, and be permanently placed on the sex offender registry. He was also required to stay away from Plaintiff.

*Plaintiff's Return to Campus in the Spring of 2014*

62.     Over winter break, Plaintiff went home to Georgia. She had a difficult time returning home and coping with her anxiety and depression. Nonetheless, she returned to the University for the Spring 2014 semester and rented an apartment with 24-hour security.

However, upon returning to campus, she immediately felt overwhelmed and realized that she would need another extension to complete her coursework from the previous semester.

63.    Plaintiff escalated the matter and asked her parents to speak with high-level administrators. On January 11, 2014, Plaintiff's parents wrote a letter to the University's President at the time, Donna Shalala, expressing their concern for their daughter's safety and requesting an academic accommodation for their daughter.

64.    On January 12, 2014, Dean Patricia A. Whitely responded, repeating the same response provided by Ms. Abramson via email: "As you know, the individual faculty member determines the requirements for each class and grading."

65.    Plaintiff quickly realized that she would be unable to remain in school that semester and requested to withdraw for the semester. Once again, the University advised her that she could not withdraw from her classes without negative markings on her transcript.

66.    Unable to cope with the University's indifference and suffering from depression, on January 25, 2014, Plaintiff attempted to take her own life.

67.    At that point, Plaintiff's parents hired an attorney to negotiate a leave of absence with the University through the University General Counsel. Despite nearly missing the deadline, the University ultimately processed Plaintiff's leave paperwork, and Plaintiff was allowed to withdraw for the semester without markings on her transcript. In an email on January 29, 2014, the General Counsel noted that even though the "drop/add" deadline for courses was about to pass, "the College of Arts and Sciences can do a retroactive withdrawal for medical reasons if it comes to that."

68.    Had the University provided these options to Plaintiff in the Fall of 2013, Plaintiff would have been spared the failing grades, the continued fear for her safety, the depression and

anxiety that stemmed from the repeated trauma she experienced in the fall of 2013, and the despair she felt from the University's inadequate responses that led to suicide attempt.

69.     In the spring of 2014, Plaintiff was admitted to the Menninger Clinic in Texas to recover from her attempted suicide. At the clinic, she received a diagnosis of Post Traumatic Stress Disorder ("PTSD"). After she was released, she attended therapy sessions three times per week and to this day attends therapy twice a week.

70.     Plaintiff returned to campus in the fall of 2014 to resume her coursework. Upon her return to campus, she and her family met with Dr. Whitely to discuss academic accommodations. Dr. Whitely once again reminded Plaintiff that she would have to address the matter with each professor individually. While several of Plaintiff's professors provided accommodations, including allowing Plaintiff to leave class early to attend therapy sessions, two of her professors refused to accommodate Plaintiff. In the fall of 2014, she earned a C and a B – in the two courses in which she was not given her requested accommodation, such as making up missed assignments or excusing absences, which were the lowest grades she earned that semester.

71.     Plaintiff graduated in May 2015, receiving a Bachelor of Science in microbiology and immunology. A highly motivated and gifted student, Plaintiff attended the University on a merit-based scholarship, the Dickinson scholarship, awarding her $20,000 per year in tuition. Until the semester of her rape, she enrolled in an average of 23 credits per semester and maintained a 3.8 Grade Point Average ("GPA"). She ultimately graduated with a 3.5 GPA and is still in the process of addressing the incompletes from the fall of 2013, which appear as failing grades on her transcript.

72.     Currently a law student at the University of Houston, Plaintiff is in the process of applying to medical school and is determined to fix her GPA to reflect the caliber of student she was before the rape, and the accurate scholastic marks she would have had without the continued threats to her safety and the University's deliberate indifference toward her being raped and stalked.

**COUNT ONE**
**Violation of Title IX – 20 U.S.C. § 1681(a)**
**(Discrimination in Violation of Title IX of the Education Amendments)**

73.     Plaintiff hereby re-alleges and incorporates by reference Paragraphs 1 through 72 as if fully set forth herein.

74.     Plaintiff reported sexual assault, stalking, and relationship violence by a University student, in violation of her right to an educational environment free from sex discrimination under Title IX.

75.     The sexual assault and all subsequent incidents perpetrated by the Assailant were so severe, pervasive, and objectively offensive that Plaintiff was deprived of access to educational opportunities or benefits provided by the University.

76.     The University's responses to her reports of sexual assault amount to an official policy of sex discrimination.

77.     The University was informed of and had knowledge that Plaintiff had been sexually assaulted. It knew the identity of her rapist, as well as the subsequent incidents of harassment, stalking, and assault.

78.     The University acted with deliberate indifference to Plaintiff's complaints of sexual assault by arbitrarily enforcing a discriminatory policy that would not allow Plaintiff to withdraw for the semester without markings on her transcript.

79.     The University acted with deliberate indifference to Plaintiff's complaints of sexual assault by failing to provide reasonable accommodations to remedy the hostile educational environment at the University.

80.     The University acted with deliberate indifference to Plaintiff's complaints of sexual assault by repeatedly denying Plaintiff's requests for reasonable accommodations that would allow Plaintiff to complete and succeed in her coursework.

81.     As a direct and proximate result of the University's unlawful acts and its violation of Title IX, Plaintiff was denied or limited in her ability to participate in or benefit from the University's educational programs or activities on the basis of sex.

82.     As a direct and proximate result of the University's unlawful acts and its violation of Title IX, Plaintiff continues to suffer lost educational and employment benefits and opportunities, lost earnings, emotional pain and trauma, and the loss of enjoyment of her life.

## COUNT TWO
### Violation of Title IX – 20 U.S.C. § 1681(a)
### (Retaliation in Violation of Title IX of the Education Amendments)

83.     Plaintiff hereby re-alleges and incorporates by reference Paragraphs 1 through 72 as if fully set forth herein.

84.     Plaintiff's report of rape and subsequent incidents of harassment, stalking, and assault constituted protected activity under Title IX.

85.     The University was informed of and had knowledge that Plaintiff had been sexually assaulted. It knew the identity of her rapist, as well as the subsequent incidents of harassment, stalking, and assault.

86.     The University acted with deliberate indifference to Plaintiff's complaints of sexual assault by denying Plaintiff's requests for reasonable accommodations that would allow Plaintiff to return home and address her suffering mental health.

87.     The University Acted with deliberate indifference to Plaintiff's complaints of sexual assault by repeatedly denying Plaintiff's requests for reasonable accommodations that would allow Plaintiff to complete and succeed in her coursework.

88.     As a direct and proximate result of the University's unlawful acts and its violation of Title IX, Plaintiff continues to suffer lost educational and employment benefits and opportunities, lost earnings, emotional pain and trauma, and the loss of enjoyment of her life.

### COUNT THREE
### Violation of § 504 the Rehabilitation Act – 29 U.S.C. § 701

89.  Plaintiff hereby re-alleges and incorporates by reference Paragraphs 1 through 72 as if fully set forth herein.

90.  Under 29 U.S.C. § 705(20), an individual has a disability if she "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment" to her academic life.

91.  Plaintiff met this definition of disability at all relevant times.

92. The University had knowledge of Plaintiff's disability. On multiple occasions, from October through December 2013, upon her return to campus in January 2014 and in all subsequent semesters, Plaintiff informed the University that she suffered from anxiety, depression, and ultimately, PTSD, and had a disability.

93. On multiple occasions, she requested reasonable accommodations for her disabilities, including allowing her to withdraw from her courses for the semester, excusing

absences to attend therapy appointments, and providing extensions for exams and assignments, as she requested.

94.  The University discriminated against Plaintiff by failing to provide a reasonable accommodation for Plaintiff's disability.

95.  As a direct and proximate result of Defendant's conduct, Plaintiff suffered harm and continues to suffer harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully seeks the following:

1.      An award of damages in an amount to be established at trial, including, without limitation, payment of Ms. Doe's expenses incurred as a consequence of the University's inadequate response to her requests for help and for a reasonable accommodation;

2.      An award of damages for deprivation of equal access to the educational benefits and opportunities provided by the University;

3.      An award of pre- and post-judgment interest;

4.      An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988(b); and

5.      Such other relief as is proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts.


Dated:  September 15, 2017


                                        Respectfully submitted,


                                         _/s/ Bradley J. Edwards_
                                        **BRADLEY J. EDWARDS**
                                        Florida Bar No.:  542075
                                        E-mail: brad@pathtojustice.com
                                        **BRITTANY N. HENDERSON**

Florida Bar No.: 118247
Email: brittany@pathtojustice.com
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
Attorneys for Plaintiff(s)
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
(954)524-2820 Telephone
(954)524-2822 Facsimile